# STATE OF MICHIGAN

# COURT OF APPEALS

WILLIAM WOODS and JANET GRAY-
WOODS,

        Plaintiffs-Appellees,

v

GENESEE COUNTY DRAIN COMMISSION,[1]

        Defendant-Appellant.

UNPUBLISHED
January 9, 2018

No. 334733
Genesee Circuit Court
LC No. 14-103684-CE

Before: METER, P.J., and SAWYER and SHAPIRO, JJ.

PER CURIAM.

Defendant appeals as of right a September 6, 2016, order denying its motion for summary disposition based on governmental immunity.

On May 8, 2015, plaintiffs, who own a home in Linden in Genesee County, filed an amended complaint alleging that a homeowners' association[2] constructed a detention[3] pond on nearby property, and the pond "and associated drains and structures" comprise a sewage system. Plaintiffs alleged that the system was defective and caused excessive water flow on plaintiffs' property on May 12, 2014, leading to damages. Plaintiff set forth five counts, labeled as follows:

---

[1] The trial court entered an order changing the name of this party to "Jeffery Wright, Genesee County Drain Commissioner, Division of Surface Water Management," but the lower-court documents, including the order being appealed, continued to display "Genesee County Drain Commission" as the party. Accordingly, we employ this latter moniker.

[2] Plaintiffs sued the homeowners' association as well as defendant, but reached a settlement with the association; it was subsequently dismissed from the case.

[3] Various parties use the term "retention pond" instead of "detention pond" throughout the lower-court record.

(1) alteration of natural surface water flow, (2) negligence, (3) trespass, (4) nuisance, and (5) "governmental liability for negligence under MCL 691.1416 et seq."[4]

On June 16, 2016, defendant filed a motion for summary disposition under MCR 2.116(C)(7). Defendant contended that plaintiffs had not set forth sufficient evidence to satisfy the statutory requirements for imposition of liability on it. In particular, defendant stated that (1) the system had merely become overwhelmed by a "100-year flood" on May 12, 2014, and plaintiffs could not demonstrate that the system had any defect; (2) even if there had been a defect, plaintiffs could not demonstrate that defendant knew or should have known about it; and (3) any alleged defect was not the proximate cause of any damage to plaintiffs' property; the cause, instead, was the rare rain event.

Defendant attached various exhibits to its motion, including deposition transcripts. Plaintiff Janet Gray-Woods testified that there was "heavy rain" on May 12, 2014. She stated that the water flowing towards the house[5] was "very polluted [with] debris." She stated that a drain that was "supposed to take water" "couldn't take it," and she ran water pumps for "hours" to try to stem the flooding. Gray-Woods stated that she did not "know of any defect in the retention pond and/or retention pond system that caused [the] flooding."

Plaintiff William Woods testified that three detention ponds sat above the property and he did not know from which pond or combination of ponds the excess water came on May 12, 2014. Woods stated that he could not be sure, but it seemed as if the pipe that distributes water to Byram Lake was distributing water that day "to the maximum." He stated that no flooding event like the one on May 12, 2014, had occurred in the 19 or 20 years he had lived at the location. He stated that some flooding had occurred in the past but he did not specify any dates for this flooding; he also stated that the water did not come from the same location (i.e., the detention ponds) those times.

Woods testified that firemen set up a pumping system on May 12, 2014, to deal with the water in attempt to prevent homes from flooding and that this "helped."

When asked if the piping system "wasn't performing properly or . . . possibly there was just too much water for it to handle," Woods answered, "I'm unsure." He admitted that he did not know what caused the overflow from the detention-pond system. He stated that he believed the ponds were not being maintained properly because there was "a lot of debris" in two of them, he had noticed erosion at some unspecified earlier date, and there had been ongoing "[d]ischarge sediment into the lake."

---

[4] The wording of the complaint is less than clear in that the first four counts refer to the plural "defendants," but from context and from plaintiffs' briefing below and on appeal, it is apparent that only the final count applies to defendant.

[5] Plaintiff William Woods indicated that the flowing water was from a detention pond or multiple detention ponds situated above the property.

Defendant attached to its motion a work-order summary showing that preventative maintenance was performed on the drainage system in question on September 25, 2013.

On August 17, 2016, plaintiffs filed a response to defendant's motion. In arguing that they had established a prima facie case, they relied, in part, on a report from Bruce Bawkon from Asti Environmental. Bawkon set forth the capacity of the ponds servicing the area in question and indicated that overflow from the ponds would discharge onto the road on which plaintiffs' house is situated (Lakeview Park Drive). Bawkon stated that *current* "GCDC-WWS Design Specification" (GWDS) standards "require[] overflow from detention ponds to be channeled to a public body of water with the available capacity of [sic] contain the projected overflow." He stated that he could not determine if the system was in accordance with GWDS standards because the GWDS standards for the date of construction were not available. He also stated: "The capacity of the discharge pipes could also be affected by blockage. In order to determine if there are additional restrictions to flow, the discharge pipes would require a camera inspection."

Plaintiffs claimed in their response brief that Bawkon testified that the system was defective because overflow should have been directed to a body of water and not to Lakeview Park Drive. Plaintiffs also claimed that Thomas Zeimet, the "original engineer on the drainage system," testified that "there must be accommodation for overflow of the detention pond and that obviously the system had failed in this flooding event." Plaintiffs attached an affidavit of their attorney, Craig McAra, who stated that he was "mak[ing] this affidavit for the purpose of verifying the current unavailability of deposition transcripts of [p]laintiffs' expert witness Bruce Balkon [sic] and [d]efendant's expert witness Thomas Zeimet." He averred that the court reporter had been unable to complete the transcripts but that "Balkon [sic] and Zeimet both testif[ied] at deposition that the relevant detention pond should have accommodated overflow thereof to avoid damage to downgradient property. Both individuals are believed to have testified that the detention pond failed in this respect."

Defendant filed an additional brief on August 22, 2016. Defendant attached records showing a total of 3.2 inches of rain falling in the relevant area between 8 a.m. and 1:45 p.m. on the date of the incident. Defendant also stated that Zeimet "testified that he does not know the reason why water was moving over the land" and that "[o]ne . . . factor[]" could be that "the rain event exceeded the design capacity of the detention pond." Defendant did not provide a transcript of Zeimet's deposition.

The motion hearing took place on August 22, 2016. Defense counsel argued that a very unusual rain event had occurred that simply overwhelmed a system that normally functions properly. He represented that Zeimet testified that "all the numbers worked out" when he designed the drainage system. Plaintiffs' counsel contended that defendant had not disputed the pleadings on some issues and that, therefore, these issues must be construed in plaintiffs' favor because the summary-disposition motion was brought under MCR 2.116(C)(7) and not (C)(10). Plaintiff then relied on the statements of Bawkon and referred to the affidavit regarding Bawkon's purported testimony. Defense counsel, in rebuttal argument, stated: "[p]laintiffs' argument comes down to simply that if you poured too much water in [a] cup, the person who designed that cup has defectively designed it."

The trial court's ruling, in its entirety, was:

> Well, I'll view this under a theory that there was poor design, that the detention pond overflowed. It didn't follow the swale which had drains for water flood. And once the flow was too powerful, then the pond overflowed toward the [p]laintiffs' house. There was – [p]laintiff says there's – [p]laintiffs' expert – engineering expert says that the detention pond lacked a defined overflow channel.
>
> And really what it comes down to is is [sic] I can't make that decision today just from written arguments by lawyers. I need to see and hear the testimony, probably inspect the site. There's a disagreement about what predictions a design engineer is supposed to make in the first place. So I'm gonna have to hear from them what the standard is. Are they supposed to design for hundred-year floods or two[-]hundred-year floods?
>
> There's too many issues for me to rule upon, so I'll deny the motion.

After the trial court's ruling, the deposition transcripts for Bawkon and Zeimet became available, and they have been provided to us on appeal. Normally, we limit our review to documents in the lower-court record, but both parties cite to the transcripts in their appellate briefs and therefore, given the de novo standard of review for summary-disposition rulings, we find it appropriate to summarize the depositions.

Bawkon agreed that the discharge pipes from the drainage system were "correct[.]" When asked, "You don't have an opinion that how they were installed wouldn't handle a 100 year flood[?]" he answered, "Correct." However, he later stated that "[t]he overflow discharge channel . . . terminates at Lakeview Park Drive, which could cause the flow of water from the detention pond that exceeded its capacity to go into the street." He stated that this was "not typical" and that Genesee County's website indicates that "you have to discharge water from your detention pond to a drain or body of water that has the capacity to accept that additional quantity of water." He admitted, however, that he did not know what standards were used to determine excess flow (such as "a hundred year flood . . . , a 25 year flood . . . , a thousand year flood"). He opined that the system was defective because "the overflow channel discharges to a street which would cause flooding." He stated that an underground culvert would address the issue but admitted that he did not know if defendant had the authority to install such a culvert.

Zeimet testified that he designed the detention-pond system. He stated that there is "no national, international standard of how a detention pond needs to be constructed." He stated that, with regard to the system in question, overflow would "go to the existing swale, and then to an enclosed 18-inch storm sewer down to the lake." He stated that "the outlet was approved," presumably referring to the 18-inch pipe. He stated that storm sewers are generally designed for a ten-year storm and that "you can always come up with a larger storm than the pipes could handle." Zeimet stated that the system was designed in accordance with "whatever the standards was [sic], I believe it's a hundred year. I'm not sure."

We review de novo a trial court's ruling regarding a motion for summary disposition. *Joseph v Auto Club Ins Ass'n*, 491 Mich 200, 206; 815 NW2d 412 (2012). Under MCR 2.116(C)(7), the court considers the "affidavits, pleadings, depositions, admissions, and other documentary evidence," and "[t]he contents of the complaint are accepted as true unless contradicted by documentation submitted by the movant." *McLean v McElhaney*, 289 Mich App 592, 597; 789 NW2d 29 (2010) (quotation marks and citations omitted). "If the pleadings or documentary evidence reveal no genuine issues of material fact, the court must decide as a matter of law whether the claim is statutorily barred" because of governmental immunity. *Id*.

MCL 691.1417(2) provides that "[a] governmental agency is immune from tort liability for the overflow or backup of a sewage disposal system unless the overflow or backup is a sewage disposal system event and the governmental agency is an appropriate governmental agency." A "sewage disposal system event" is defined as

> the overflow or backup of a sewage disposal system onto real property. An overflow or backup is not a sewage disposal system event if any of the following was a substantial proximate cause of the overflow or backup:
>
> > (*i*) An obstruction in a service lead that was not caused by a governmental agency.
> >
> > (*ii*) A connection to the sewage disposal system on the affected property, including, but not limited to, a sump system, building drain, surface drain, gutter, or downspout.
> >
> > (*iii*) An act of war, whether the war is declared or undeclared, or an act of terrorism. [MCL 691.1416(k).]

" 'Substantial proximate cause' " means a proximate cause that was 50% or more of the cause of the event and the property damage or physical injury." MCL 691.1416(l).

MCL 691.1417(3) states:

> If a claimant, including a claimant seeking noneconomic damages, believes that an event caused property damage or physical injury, the claimant may seek compensation for the property damage or physical injury from a governmental agency if the claimant shows that all of the following existed at the time of the event:
>
> > (a) The governmental agency was an appropriate governmental agency.
> >
> > (b) The sewage disposal system had a defect.
> >
> > (c) The governmental agency knew, or in the exercise of reasonable diligence should have known, about the defect.

(d) The governmental agency, having the legal authority to do so, failed to take reasonable steps in a reasonable amount of time to repair, correct, or remedy the defect.

(e) The defect was a substantial proximate cause of the event and the property damage or physical injury.

Plaintiffs have failed to set forth a prima facie case under MCL 691.1417(3) because the pleadings and documentary evidence show no genuine issue regarding a defect in the drainage system about which defendant knew, or in the exercise of reasonable diligence, should have known. The crux of plaintiffs' argument is that the system was improperly designed because it could not handle the amount of rain that fell on May 12, 2014. It is true that Bawkon opined that the system was "defective" because of the discharge of overflow water to the street, but Bawkon also stated that he did not know how the primary discharge pipes would handle a 100-year flood and did not know what standards were used to determine excess flow. Zeimet stated that the system was designed in accordance with "whatever the standards [were], I believe it's a hundred year" and gave unrebutted testimony that there could always be a larger storm than pipes are designed to handle. Plaintiffs claim that "[t]he lack of accommodation for overflow for drainage was apparent upon casual observation," but given the unrebutted testimony that the system was designed to standards existing at the time of construction and given the lack of a similar flooding incident in the 19 or 20 years that Woods had lived at the address, there is simply no basis to conclude that the system had a defect about which defendant knew or should have known. Woods testified that there had been some less-extensive flooding on the property in the past, but he stated that the water in those occasions had come from a different location than the water on May 12, 2014, and he did not specify whether those earlier incidents were before or after the installation of the system in question.[6] Quite simply, the system had been functioning properly as designed for many, many years, and defendant had no reason to believe that it was defective.

Our dissenting colleague states that Woods testified "that his garage and porch had previously flooded on at least three occasions during heavy rains and that he had notified the defendant only to receive a response he described as 'little to none.' " We emphasize, first, that Woods stated that there had been flooding in his home in the past, but he could not specify a timeframe; he had lived there for 22 years, before installation of the system in question. In addition, he also specifically testified that the water "on all those [prior] occasions" did not come from "the same location. This one came from the retention." The testimony in question simply does not support plaintiffs' position.

---

[6] Plaintiffs stated in the complaint that "residents . . . have complained to various government agencies about . . . flooding" since construction of the system, but again, Woods testified that the water came from a different location in the prior incidents. He said that the water was "[n]ot from the same location. This one came from the retention."

Reversed and remanded for entry of judgment in favor of defendant.  We do not retain jurisdiction.


/s/ Patrick M. Meter
/s/ Joel P. Hoekstra